UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03052

Jordan Feltner, Jessica Savage,
and Mary Hannah Williams,

　　　　　　　Plaintiffs,

　　　v.

Dragonfly Entertainment Group LLC d/b/a Blush & Blu,
and Jody Bouffard

　　　　　　　Defendants.

---

## COMPLAINT AND JURY DEMAND

---

1.   This case involves the mistreatment and underpayment of queer and transgender workers at Blush & Blu, one of the few remaining lesbian-centric bars left in the United States.[1]

2.   Lesbian-centric bars have long played a crucial role in building queer community and creating a safe space for queer and transgender individuals, but Blush & Blu has not always been a safe space for its workers. The important role of these establishments does not excuse the mistreatment and underpayment of queer and transgender workers, who are often more marginalized and vulnerable than the owners of these establishments.

---

[1] Alicia Wallace, *There Are Roughly Two Dozen Lesbian Bars in the United States. The Ones That Are Left Are Evolving to Survive* (July 1, 2021), *available at* https://www.cnn.com/2021/06/30/business/lesbian-bars-united-states/index.html ("In the 1980s, the US was home to more than 200 lesbian bars. Now it has only about two dozen left in operation.")

3.   In fact, Jody Bouffard, individually and through Dragonfly Entertainment Group LLC, willfully weaponized the so-called "safe space" and the "family" at Blush & Blu to create a culture of obligation where workers were required to accept mistreatment and brazen underpayment as a "service" to the bar and broader queer community.

4.   Jordan Feltner, Jessica Savage, and Mary Hannah Williams ("Plaintiffs"), by and through undersigned counsel, file this Complaint against Dragonfly Entertainment Group LLC, d/b/a Blush & Blu ("Blush") and Jody Bouffard (collectively "Defendants"), and allege as follows:

## JURISDICTION AND VENUE

5.   The Court has jurisdiction over the parties and subject matter of this action pursuant to 29 U.S.C. § 201 et seq. and 28 U.S.C. § 1331.

6.   The Court has supplemental jurisdiction over Plaintiffs' state law claims by authority of 28 U.S.C. § 1367, on the grounds that they relate to federal law claims over which the Court has original jurisdiction that form part of the same case or controversy.

7.   Venue lies with this Court pursuant to 28 U.S.C. 1391(b) and 29 U.S.C. 201 et seq. because Plaintiffs were employed in this District and a substantial amount of the conduct giving rise to Plaintiffs claims occurred within this District and because all parties reside in this District.

8.   Prior to the institution of this lawsuit, Plaintiff Savage timely filed a Charge of Discrimination (Charge No. E2100011129) with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC") against Defendants alleging discrimination based on race, color, and ancestry in violation of state and federal law.

9.   Plaintiff Savage received a Notice of Right to Sue from the CCRD on her Charge of Discrimination.

## PARTIES

10. At all times material to the allegations of this complaint, Plaintiff Jordan Feltner was a resident of and domiciled in the District of Colorado.

11. At all times material to the allegations of this complaint, Plaintiff Jessica Savage was a resident of and domiciled in the District of Colorado.

12. At all times material to the allegations of this complaint, Plaintiff Mary Hannah Williams was a resident of and domiciled in the District of Colorado.

13. At all times material to the allegations of this complaint, Dragonfly Entertainment Group LLC was a Colorado limited liability company.

14. Dragonfly Entertainment Group LLC does business as Blush & Blu, which has been located at 1526 East Colfax Ave in Denver, Colorado since 2012.

15. At all times material to the allegations of this complaint, Jody Bouffard has owned and operated Blush & Blu and has been a resident of and domiciled in the District of Colorado.

## FACTUAL ALLEGATIONS

**A.      Dragonfly Entertainment Group LLC and Jody Bouffard Employed Plaintiffs at Blush.**

16. Blush has long been a fixture of queer nightlife in Denver. In addition to serving drinks and sometimes food, Blush hosts special events such as open mic nights, karaoke, bingo and speed dating. Blush is also available for private event rentals.

17. Bouffard, as the principal owner or controlling officer of Dragonfly Entertainment Group LLC exercised financial control over Blush and determined the Plaintiffs' terms and conditions of employment, including their compensation structure.

18. For example, Bouffard hired, fired, trained, directed, and oversaw staff; exercised control over staff pay and other financial matters; determined the weekly schedule; managed inventory and vendor relations; and was responsible for marketing and public relations.

19. Most Blush staff members were bartenders, whose duties typically included verifying the identification and age of customers, preparing and serving alcoholic beverages, accepting payment from customers, cleaning glasses and bar utensils, and recording sales. Bartenders also performed other tasks such as making sure the tables were clean, mopping floors, taking out the trash, and stocking the bar.

20. In addition to bartenders, Blush employed barbacks, whose duties typically included restocking garnishes, stocking napkins, hauling ice, bringing glassware to the dishwasher, and chatting with customers.

21. Blush also employed security personnel, whose duties typically included ensuring bar patrons were of legal age and maintaining a safe environment for customers and staff.

22. Bartenders, barbacks, and security personnel were employees employed by Blush and Defendant Bouffard.

23. They all performed labor and services for the benefit of and involving the primary work of Blush and Defendant Bouffard.

24. Blush and Defendant Bouffard suffered and permitted, directed, and otherwise controlled their work.

25. Blush required certain employees to participate in what is commonly called a "tip pool," in which those employees who receive tips directly from customers pool their tips

with other employees who assist in servicing the customer. The pool of tips is later distributed among certain employees in the service chain.

26. At Blush, bartenders and barbacks generally participated in a tip pool whenever multiple tipped employees worked the same shift.

27. In general, for shifts when no barback was working, bartenders were instructed to divide tips proportionally between any bartenders working the same shift pursuant to the total hours worked by each bartender.

28. Prior to approximately the summer of 2019, when there was a barback working, bartenders were generally instructed to give 20% of earned tips to the barback and split the remainder proportionally between the bartenders.

29. Prior to approximately the summer of 2019, if someone was working as both security and a barback, bartenders were generally instructed to give between 0% and 10% of earned tips to the barback and split the remainder proportionally between the bartenders.

30. After approximately the summer of 2019, when there was a barback working, Bouffard instructed bartenders to give the barback a portion of the tips depending on the bartenders' subjective assessment of "how helpful" the barback had been and split the remainder proportionally between the bartenders.

*Jordan Feltner*

31. Blush employed Feltner as a bartender, barback, and as security from approximately October 2012 to February 2017 and August 2018 to July 2020.

32. From the beginning of his employment until approximately November 2018, Defendants paid Feltner approximately $5 per hour when he worked as a bartender.

33. From approximately November 2018 to the end of his employment, Defendants paid Feltner approximately $7.02 per hour when he worked as a bartender.

34. Throughout his employment, Feltner also participated in the tip pool when working as a bartender.

35. Upon information and belief, Defendants paid Feltner approximately $7 per hour when he worked as a barback until approximately November 2018.

36. Upon information and belief, from approximately November 2018 until the summer of 2019, Defendants paid Feltner between approximately $7 and $10 per hour when he worked as a barback.

37. Throughout his employment, Feltner usually participated in the tip pool when working as a barback.

38. During the summer of 2019, Defendants decided to stop paying barbacks, including Feltner any base wage, including for shifts where the tips received by barbacks were less than minimum wage.

39. Instead, Defendants instructed the bartenders to compensate the barback with an unspecified portion of the tips collected during the shift.

40.  From the summer of 2019 until the end of Feltner's employment, Feltner was only compensated a portion of pooled tips when working as a barback.

41. From the beginning of his employment to approximately November 2018, Defendants paid Feltner approximately $10 per hour when he worked security.

42. From approximately November 2018 to the end of his employment, Defendants paid Feltner approximately $15 per hour when he worked security.

*Jessica Savage*

43. Blush employed Savage as a bartender from approximately August 2015 to February 2017 and August 2018 to July 27, 2020.

44. From the beginning of her employment to approximately November 2018, Defendants paid Savage approximately $5 an hour.

45. From approximately November 2018 to June 2020, Defendants paid Savage approximately $7.02 an hour.

46. When Blush reopened after a temporary closure in 2020 due to the COVID-19 pandemic, Defendants started paying some bartenders approximately $8.98 an hour.

47. In June and July of 2020, Defendants paid Savage approximately $8.98 an hour when she worked as a bartender.

48. Throughout her employment, Savage also participated in the tip pool.

*Mary Hannah Williams*

49.    Defendants employed Williams in various positions sporadically from approximately May 2009 to June 2015.

50.    Defendants employed Williams as a bartender, and sometimes as security, from approximately October 2015 to July 2020.

51.     From the beginning of her employment in 2009 to approximately November 2018, Defendants paid Williams approximately $5 an hour when she worked as a bartender.

52.    From approximately November 2018 to June 2020, Defendants paid Williams approximately $7.02 an hour when she worked as a bartender.

53.    In June and July of 2020, Defendants paid Williams approximately $8.98 an hour when she worked as a bartender.

54. When Williams worked as security after 2015, her pay ranged from approximately $8 to $12 an hour.

55. Throughout her employment, Williams also participated in the tip pool when she worked as a bartender.

**B.  Defendants Intentionally Created a Culture of Obligation Where Workers Were Pressured to Accept Mistreatment and Little to No Pay**

56. Defendants created a culture at Blush where workers, including Plaintiffs, were expected to work for little to no pay as a "favor" to Blush and the broader queer community.

57. Occasionally, Defendants would even target particularly vulnerable workers to elicit free labor in exchange for support and community.

58. For example, around the time Williams started frequenting Defendants' establishment, Defendant Bouffard allowed Williams to use Defendants' internet for free. In exchange, Williams was expected to perform labor, including tasks like taking out the trash and getting ice, without pay.

59. Similarly, before Feltner began working at Blush, Defendant Bouffard would offer Feltner free or discounted drinks in exchange for uncompensated labor, such as taking out the trash or stocking the bar.

60. Bouffard did not provide Feltner wages for the labor he performed.

61. Defendants also promised their workers a sense of "family" and belonging to entice workers, including Plaintiffs, to work for little or no pay.

62. By creating a sense of dependency on and debt to Blush, alongside the promise of family and belonging, Defendants fostered a culture of obligation where workers,

including Plaintiffs, were expected to be "thankful" for the opportunity to work at Blush despite Defendants' mistreatment and failure to properly compensate workers.

63.     When workers asked questions about Blush's compensation and lack of record keeping, including why Blush did not pay workers minimum wage, Bouffard would tell them that paying higher wages and other costs and fees would threaten Blush's ability to stay open, insinuating that if workers complained, workers would lose their jobs and the queer community would lose Blush as a gathering space.

64.     Bouffard even told workers that Blush's compensation and lack of record keeping actually helped workers avoid additional costs and expenses.

65.     This culture of obligation continued throughout Plaintiffs' employment at Blush.

66.     If Plaintiffs or other workers spent time at Blush when they were not scheduled to work, Defendants often expected them to work, including by covering the bar, going to get ice, or performing other tasks.

67.     Defendants failed to compensate Plaintiffs for this off-shift work. Rather, Defendants would sometimes provide Plaintiffs free or discounted drinks.

**C.  Defendants Willfully Failed to Comply with Local, State, and Federal Record-Keeping Standards**

68.     Upon information and belief, Defendants did not keep accurate records of wages and/or tips earned, or of hours worked by Plaintiffs.

69.     While Defendants required employees to track their hours, Plaintiffs received weekly paychecks from Defendants that failed to properly compensate them for all the hours they worked.

70.     Defendants also instructed employees to perform unrecorded and unpaid labor during times they were at Blush but not scheduled to work.

71.     Defendants also failed to furnish Plaintiffs with accurate statements of wages, hours worked, rates paid, gross wages, and the claimed tip allowance.

72.     In fact, Defendants failed to furnish Plaintiffs with any wage statement at all.

73.     In June 2020, Defendants decided to start tracking and recording some workers' hours, including Plaintiffs Williams and Savage.

74.     However, because Feltner worked fewer and less regular shifts, Defendants continued to fail to properly track or record Feltner's hours and did not provide him with wage statements.

**D.   Defendants Willfully Failed to Comply with Local, State, and Federal Minimum Wage Standards**

75. Defendants utilized the culture of obligation to set wages for their workers, including Plaintiffs, with blatant disregard to local, state, and federal wage laws.

76. For example, the $5 per hour rate paid to bartenders until approximately November 2018 had no connection to legally required rates.

77. In fact, the $5 per hour rate was below the state and federal minimum wage throughout Plaintiffs' employment and was below the state tipped minimum wage since January 2015.

78. Similarly, the $7 per hour rate paid to barbacks until at least November 2018 also had no connection to legally required rates.

79. The $7 per hour rate was below the state and federal minimum wage throughout Plaintiffs' employment and was below the state tipped minimum wage since the beginning of 2018.

80. Similarly, the shift to a $7.02 per hour rate paid to bartenders in approximately November 2018 also had no connection to legally required rates.

81. In fact, the $7.02 per hour rate was below the local, state and federal minimum wage, and the state tipped minimum wage.

82. The wage of approximately $7 to $10 per hour paid to barbacks from approximately November 2018 until the summer of 2019 was also below state minimum wage.

83. Even the shift to paying some bartenders $8.98 in June 2020, which was the state tipped minimum wage, fell below the local tipped minimum wage.

84. The 2019 shift to generally paying barbacks no direct wages and only a percentage of tips also had no connection to legally required rates, violating local, state, and federal law.

85. Upon information and belief, Defendants made no efforts to comply, attempt to comply, or even assess the applicability of local, state, and federal wage laws, including regulations surrounding the use of the tipped employee minimum wage, until at least June 2020.

86. Defendants also continued to utilize the culture of obligation to extract free labor from workers, including Plaintiffs, for other work that benefited Defendants, such as the renovations to Blush during the closures related to COVID-19 and other off-the-clock work.

***Defendants Misused Employee Tips***

87. At all times relevant, Defendants purported to pay Plaintiffs at a reduced wage rate when they worked as bartenders or barbacks because Plaintiffs received tips for some of their work.

11

88. In some circumstances, employers can claim a "tip credit," which allows employers to take a credit for employee tips to offset the direct wages of tipped employees as long as the employee's tips combined with the employer's direct wages of at least the tipped minimum wage add up to at least minimum wage.

89. However, Defendants failed to satisfy any of the requirements under the FLSA or Colorado wage laws that would allow them to claim a tip credit.

90. To start, Defendants did not provide Plaintiffs with oral or written notification of the tipped minimum wage or tip credit provisions of the FLSA, Colorado, or local wage laws.

91. Similarly, Defendants failed to notify each customer in writing that employees were required to share or allocate tips as part of a "tip pool."

92. Defendants also failed to provide Plaintiffs with a base wage that met or exceeded the state tipped minimum wage when working as bartenders until mid-2020 and failed to provide a base wage that met or exceeded the Denver tipped minimum wage throughout 2020.

93. Defendants similarly failed to provide Feltner with a base wage that met or exceeded the state tipped minimum wage when working as a barback in at least part of 2018, at least part of 2019, and throughout 2020, and failed to provide a base wage that met or exceeded the Denver minimum wage throughout 2020.

94. Additionally, for at least some of Plaintiffs' employment, the "tip pool" tips were not allocated on a "pre-established basis."

95. For example, starting in the summer of 2019, Defendants instructed bartenders, including Plaintiffs, that if they wanted to work with a barback, they had to compensate the barback with an unspecified portion of the tips received on their shift.

96. As another example, upon information and belief, on some occasions such as Pride weekend, Defendants would allocate tips from the tip jar to tipped employees based on Bouffard's subjective impression of how well each tipped employee had performed at work.

97. Defendants also regularly required bartenders and barbacks, including Plaintiffs, to spend time performing non-tip producing tasks that were unrelated to their tipped work, including but not limited to sweeping, mopping, and vacuuming Blush's entire space, including event spaces; performing in depth cleaning of Blush's entire space before and after Pride weekend and other big events; stocking, cleaning, and maintaining bathrooms; cleaning and maintaining the street in front of Blush, including by shoveling snow; checking customer identification at the front door when there was no employee working security; setting up event spaces; making shopping lists when supplies were low, including general cleaning supplies; and cleaning the front door, windows, and mirrors.

98. Defendants also failed to allow bartenders and barbacks to retain all of the tips they earned during their shifts.

99. For example, on days Bouffard worked at the bar, Bouffard would participate in the tip pool despite the well-known prohibition of management participation.

100.    To make matters worse, Bouffard also regularly took tips out of the tip jar for Blush or for her personal use.

101.    For example, on at least a few occasions, Feltner saw Bouffard take money out of the tip jar to buy alcohol to stock the bar.

102.    On nights Bouffard was at the bar, Bouffard would regularly take money from the tip jar and tell employees she had "tipped herself out."

103.     Bouffard would also regularly take the tip jar outside of the presence of employees, purportedly to "count tips."

104.     On other occasions, Bouffard would take money from the tip jar to "make change" or "trade out low value bills."

105.     Plaintiffs observed that on nights Bouffard "tipped herself out," privately "counted tips," "made change," or "traded out low value bills," they almost always went home with far fewer tips than they earned on nights with a similar customer volume when Bouffard did not engage in these practices.

106.     Plaintiffs also observed that on nights Bouffard was at the bar, if they stepped away from the bar for a break or to stock the bar or perform other tasks, they would often notice that their tip jar appeared less full than they remembered it being before they stepped away.

107.     Defendants also failed to ensure that Plaintiffs received at least the minimum wage between their direct wages and their tips combined.

108.     In fact, upon information and belief, Defendants did not track and made no record at all of the amount of cash tips received by Plaintiffs.

109.     Plaintiffs' direct wages and tips combined did not always equal at least minimum wage.

110.     For example, Feltner once received approximately $17 of tips during an eight-hour shift. That means Feltner earned approximately $2.125 an hour in tips, bringing his total hourly earnings (wages plus tips) to approximately $9.145 an hour, which was below state and local minimum wage.

111.    As another example, during the "early shift" or "day shift" on Fridays, Savage regularly worked approximately four-hours shifts and regularly received tips ranging from the teens to low twenties.

112.    That means on Fridays Savage regularly earned $3 to $5 an hour in tips, bringing her total hourly earnings (wages plus tips) to only approximately $8 to $10 when she was paid a rate of $5 an hour and approximately $10 to $12 an hour when she was paid a rate of $7.02 an hour. Both ranges fell below state and local minimum wage.

113.    On another night, Savage received only approximately $25 in tips during a ten-hour shift. That means Savage earned approximately $2.50 an hour in tips, bringing her total hourly earnings (wages plus tips) to only approximately $9.52 an hour, which was below state and local minimum wage.

114.    Similarly, Williams regularly worked approximately 7-hour shifts on Sundays and regularly earned as low as $25 in tips for the entire shift. That means Williams regularly earned as low as $3.57 in tips, bringing her total hourly earnings (wages plus tips) to as low as $8.57 an hour when she earned $5 an hour in wages and $10.59 an hour when she earned $7.02 an hour in wages, which was at least sometimes under state and local minimum wage.

115.    When Plaintiffs' direct wages and tips combined did not equal at least minimum wage, Defendants did not pay the difference.

***Defendants Failed to Compensate Plaintiffs for Their Work During Its COVID-19 Closure***

116.    In March 2020, Blush was forced to close its doors because of the COVID-19 pandemic.

117.    Blush's workers, however, were not all able to follow local health guidelines and stay home during the pandemic.

118.    Instead, after the closure, Blush management called a meeting of Blush bartenders, including Plaintiffs Savage and Williams, and announced their plans to renovate the bar.

119.    Although bartenders were not required to assist in the renovation, Defendants pressured Savage and Williams to "volunteer" to renovate the bar without pay during the closure.

120.    The renovation work performed by Plaintiffs at Blush included demolition, cleaning, painting, and laying floors, among other tasks.

121.    Savage and Williams worked on the renovations for approximately twenty to twenty-five hours a week in May and June.

122.    Feltner also worked on the renovations for several hours in May or June.

123.    Plaintiffs were not compensated *at all* for the labor they performed renovating Blush during its temporary closure due to the COVID-19 pandemic.

**C. Defendants Willfully Failed to Comply with Local, State, and Federal Overtime Standards**

124.    Defendants utilized the culture of obligation to violate applicable overtime pay requirements.

125.    Upon information and belief, Defendants made no efforts to comply, attempt to comply, or even assess the applicability of local, state, and federal overtime requirements.

126.    During a typical week, Plaintiffs did not work more than twelve hours in a day or forty hours in a week.

127.    However, during Pride week, an annual celebration in June when LGBTQ+ Pride is celebrated in Denver, Plaintiffs worked very long hours.

128.     For example, during Pride week in June of 2013, Feltner worked approximately 48 hours over the span of three days, even sleeping at Blush two nights between open and close.

129.     Upon information and belief, Savage worked over forty hours a week or twelve hours a day during Pride week in 2016.

130.     Williams worked over forty hours a week or twelve hours a day during Pride week most years from the beginning of her employment through 2019.

131.     In addition, Williams worked more than forty hours a week or twelve hours a day occasionally throughout her employment when she filled in for other bartenders' regularly scheduled shifts.

132.     Defendants never paid Plaintiffs an overtime premium of one and a half times their regular rate despite working overtime hours.

**D. Defendants Willfully Filed Fraudulent Information Returns with Respect to Payments Purportedly Made to Plaintiffs Feltner and Savage**

133.     Defendants knew they had a duty to accurately report wages, tips, and other compensation paid to Plaintiffs to the Internal Revenue Service (IRS) by filing accurate information returns.

134.     Defendants willfully filed inaccurate and fraudulent information returns with respect to payments Defendants made to Savage and Feltner in 2020.

135.     Defendants filed a fraudulent 1099-NEC form with the IRS regarding wages Defendants purportedly paid to Feltner in 2020.

136.     The filing was inaccurate and fraudulent because it misclassified Feltner as a "nonemployee," and falsely stated that Feltner "refused" to provide his tax identification

number, and, upon information and belief, underreported the amount of wages earned by Feltner from Blush in 2020.

137.    Upon information and belief, Defendants knew that the 1099-NEC regarding Feltner did not accurately describe the wages Defendants paid Feltner during 2020.

138.    Defendants knew that Feltner was an employee.

139.    Defendants knew that they had never requested Feltner provide his tax identification number and that he never refused to provide it.

140.    Defendants filed both a fraudulent 1099-NEC form and a fraudulent W-2 form with the IRS regarding wages Defendants purportedly paid to Plaintiff Savage in 2020.

141.    The 1099-NEC was fraudulent because it underreported the total amount of wages Defendants paid Savage in 2020 and misclassified Savage as a "nonemployee."

142.    The W-2 was fraudulent because it underreported the total amount of wages Defendants paid Savage in 2020.

143.    Notably, the 1099-NEC and the W-2 reported vastly different amounts, even though they both purported to describe the compensation Defendants paid Savage in 2020.

144.    Defendants knew that the 1099-NEC and W-2 regarding Savage did not accurately describe the wages Defendants paid Savage in 2020.

145.    Defendants knew that Savage was an employee.

146.    Defendants intentionally and voluntarily filed the inaccurate and fraudulent 1099-NEC and W-2 forms regarding Feltner and Savage with the IRS.

**E. Defendants Discriminated Against Plaintiff Savage Based on Race and Color**

147.    Plaintiff Savage is a Black, Haitian-American woman.

148.    Throughout Plaintiff Savage's employment at Blush, Defendants fostered a hostile work environment, treated her differently compared to white bartenders, constructively discharged Plaintiff Savage, and otherwise discriminated against her based on race and color.

***Bouffard Made Severe and Pervasive Derogatory, Racialized Comments***

149.    Bouffard persistently made derogatory, racialized comments to or in front of Savage.

150.    For example, Bouffard frequently made comments to Savage about having "jungle fever," which meant an attraction to Black women.

151.    On many occasions, Savage explained that the phrase "jungle fever" was racist and inappropriate. Bouffard nevertheless continued to use the phrase in Savage's presence.

152.    Bouffard frequently referred to hip hop and other genres traditionally performed by Black artists as "urban" music or "your" music (directed to Savage).

153.    On at least one occasion, Bouffard accused Savage of "playing the race card."

154.    In approximately October 2018, Savage suggested the bar start a "Melanin Monday" night at the bar to create a space for people of color. Mondays were generally low patronage nights and Savage regularly worked those shifts alone, so Bouffard agreed.

155.    However, Bouffard repeatedly referred to the event as "Melatonin Mondays," in reference to the sleep aid and implying the event was boring or otherwise sleep-inducing, instead of "Melanin Mondays," which referred to dark skin pigment.

156.    Although Savage repeatedly corrected Bouffard, Bouffard continued to refer to the event as "Melatonin Mondays."

157.    Bouffard would also make other unsavory, racialized comments to Savage like "I can tan to be as dark as you."

158.    These comments were so pervasive that Savage could predict them before Bouffard would make them. Savage often knew what the racist and derogatory "punchline" of these comments would be before Bouffard finished saying them.

159.    Bouffard also used severely derogatory language. On one particularly memorable occasion, Savage received a video of Bouffard using the n-word when yelling at a Black man on the street outside of Blush.

160.    When Savage mentioned race or attempted to discuss the mistreatment by Bouffard, Bouffard often dismissed her or responded with noticeable hostility.

161.    For example, on one occasion, Bouffard came to work with cornrows in her hair.  Savage attempted to explain that a white woman adopting a traditionally Black hairstyle would be inappropriate cultural appropriation. Bouffard dismissed Savage's concerns entirely without giving her the opportunity to explain why the style was problematic. In fact, Bouffard actually had her cornrows redone after this conversation took place.

162.    On other occasions, when Savage would attempt to discuss the mistreatment, Bouffard would tell Savage that if she did not like it, she could quit.

***Defendants Subjected Savage to Disparate Treatment and Other Discrimination Based on Race and Color***

163.    Bouffard's derogatory, racialized comments were made against a backdrop of pervasive disparate treatment of Savage based on color and race.

164.    Defendant Bouffard targeted Savage with increased scrutiny and discipline, sometimes under the guise of enforcing facially neutral policies.

165.    Indeed, Bouffard often had different, harsher, standards by which she judged Savage, who is Black and Haitian-American, compared to similarly situated white bartenders.

166.    For example, while it was standard practice for bartenders to choose the music playing during their shift, Bouffard instructed Savage not to play hip hop and other genres traditionally performed by Black artists, which Bouffard referred to as "urban" or "your" music (referring to Savage). Bouffard went so far as to hide the remote control for the stereo system during some of Savage's shifts, in an apparent attempt to ensure Savage did not play the "urban" music Bouffard found objectionable.

167.    Bouffard did not enforce any restrictions of white bartenders' choice of music, and white bartenders played a variety of music genres, including those traditionally performed by Black artists, during their shifts.

168.    For example, Williams, who is white, would often play hip hop music during day shifts she worked at Blush. Some of the music she played would be considered "explicit." She was never disciplined or told to stop playing hip hop music during the day.

169.    When Savage complained about Bouffard's race-based restriction on the music she could play, Bouffard told Savage that if she didn't like it, she could quit.

170.    On one occasion in late 2019, when Savage asked Bouffard about why she couldn't play "urban" music during her shifts while white bartenders did not have the same restriction, Bouffard accused Savage of playing the "race card."

171.    As another example, Blush purports to have a facially neutral policy that bartenders were required to take out the trash. However, Bouffard enforced this policy more stringently against Savage than her similarly situated white coworkers.

172.    Savage would often show up to work her day shifts to find that the trash had not been taken out by a white bartender working the night before. Upon information and belief, these white bartenders were not reprimanded or disciplined for failing to take out the trash.

173.    For example, Williams, who is white, routinely left trash for whoever was working the following morning at the end of her night shifts, and she was never disciplined or reprimanded in any way for failing to take out the trash.

174.    In contrast, if Savage failed to take out the trash, she would be reprimanded.

175.    Defendants also provided Savage with fewer opportunities to take on higher-earning shifts than similarly situated white coworkers.

176.    For example, throughout most of Savage's employment, Bouffard assigned Friday night shifts, where bartenders earned the highest amount of tips, to similarly situated white bartenders more often than Savage.

177.    In fact, when a white bartender was unable to work during one of their regularly-scheduled, high-earning shifts such as Friday night, Bouffard would either work the shift herself or offer the shift to white bartenders instead of Savage.

178.    Bouffard rarely, if ever, provided Savage the opportunity to fill in for other bartenders on the highest-earning shifts such as Friday night, even when Bouffard had already offered the shift to white bartenders and the white bartenders had declined.

179.    As another example, during Pride 2019, Bouffard did not assign Savage any shifts, despite the fact that Pride is a very busy week and usually requires all employees to work.

180.     Upon information and belief, all of the white bartenders were scheduled to work during Pride 2019.

181.     Bouffard also publicly ridiculed Savage disproportionately compared to white bartenders.

182.     For example, once, on Savage's birthday, a celebration was held at the bar. Bouffard took it upon herself to turn the celebration into a "roast," criticizing Savage in front of her coworkers and friends.

183.     In contrast, when white coworkers held similar celebrations, Bouffard did not publicly mock them.

184.     In fact, approximately a month after the birthday when Bouffard criticized Savage, a similarly situated white bartender had a birthday, which Bouffard honored by publicly praising the white bartender and giving her a cash gift.

185.     Bouffard's antagonism toward Savage continued throughout the course of her employment at Blush.

***Defendants Constructively Discharged Savage and Continued to Discriminate Against Her Based on Race and Color***

186.     Throughout Savage's employment, when she complained about Bouffard's mistreatment, Bouffard told Savage that if she was unhappy with her treatment, she should quit.

187.     Because of years of disrespect and mistreatment, Savage finally resigned on July 27, 2020.

188.     Bouffard's disparate treatment of Savage continued after Savage's resignation.

189.    For example, after Savage resigned, Bouffard forbid her from coming to Blush, functionally excluding Savage from the only lesbian-centric bar, and one of the few lesbian-centric spaces, in Denver.

190.    When similarly situated white employees resigned or were fired from Blush, Bouffard did not ban them from Blush. For example, Bouffard did not ban Feltner and Williams from the bar when they resigned shortly after Savage.

191.    In yet another departure from how Bouffard treated other employees, upon information and belief, Bouffard undermined Savage's job search by telling prospective employers false and misleading information about her employment at Blush.

192.    For example, when Savage applied at a different queer-centric establishment in Denver, a hiring manager told her that the establishment could not hire her. The hiring manager explained that they did not hire former employees of other queer establishments, but in fact that establishment has hired other former employees of queer establishments.

193.    Upon information and belief, the hiring manager's actual motivation was a negative reference from Bouffard or another representative of Blush.

194.    At the same time, Savage became aware that rumors were circulating about her around the queer bar community, including false allegations created by Bouffard.

195.    Savage was not able to find new employment until she removed Blush from her resume.

196.    Upon information and belief, Bouffard did not interfere with the job search of similarly situated white employees.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF: BREACH OF THE FAIR LABOR STANDARDS ACT (FLSA) 29 U.S.C. §§ 201 *ET SEQ.*

#### (All Plaintiffs Against All Defendants)

197.    Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

198.    Plaintiffs were "employees" as that term is defined by 29 U.S.C. § 203(e) because, as described more fully above, each Defendant had the ability to exert significant control over Plaintiffs, including by handling hiring and firing, job applications, training; controlling when, where, and how Plaintiffs worked; setting Plaintiffs' rate of pay and tenancy; determining when and how Plaintiffs would be paid; and employing Plaintiffs' limited employment records.

199.    Defendants "employed" Plaintiffs.

200.    During their entire employment, Plaintiffs were engaged in commerce or in the production of goods for commerce. In particular, Plaintiffs handled many goods, including liquor, beverages, cleaning items, and other items that traveled in interstate commerce. Plaintiffs also routinely processed payment from bar patrons using credit cards.

201.    As the employers of Plaintiffs, the Defendants were required to pay Plaintiffs minimum wage and overtime pursuant to 29 U.S.C. §§ 206-207 and failed to do so.

202.    The failure to pay minimum wage and overtime was willful pursuant to 29 U.S.C. § 255(a) because the Defendants knew or showed reckless disregard for the fact that Plaintiffs were covered by the FLSA and therefore entitled to minimum wage and/or, upon information and belief, they failed to account for or make adequate inquiry regarding whether the Plaintiffs were covered by FLSA for this work.

203.     Plaintiffs are therefore entitled to the following pursuant to 29 U.S.C. § 216: unpaid minimum wage and overtime, statutory liquidated damages, reasonable attorney's fees, and costs.

**SECOND CLAIM FOR RELIEF: FAILURE TO PAY THE MINIMUM WAGE AND OVERTIME PURSUANT TO THE COLORADO MINIMUM WAGE ACT, 8-6-101 *ET SEQ.***

**(All Plaintiffs Against All Defendants)**

204.     Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

205.     At all material times, Defendants have been "employers" within the meaning of the Colorado Minimum Wage Act.

206.     At all material times, Defendants employed Plaintiffs within the meaning of the Minimum Wage Act.

207.     At all material times, Plaintiffs were "employees" of Defendants within the meaning of the Minimum Wage Act.

208.     Defendants failed to pay Plaintiffs minimum wage for all hours worked.

209.     The failure to pay minimum wage was willful because the Defendants knew or showed reckless disregard for the fact that Plaintiffs were covered by the Colorado Minimum Wage Act and therefore entitled to minimum wage.

210.     Defendants failed to pay Plaintiffs overtime for hours worked both in excess of 40 hours a week and in excess of 12 hours a day.

211.     The failure to pay overtime was willful because the Defendants knew or showed reckless disregard for the fact that Plaintiffs entitled to overtime.

212.     Plaintiffs demand payment in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing. Such payment should be made care of undersigned counsel at the listed address.

213.     Plaintiffs seek recovery of these unpaid wages and additional damages, costs, and attorney's fees pursuant to Colorado law.

**THIRD CLAIM FOR RELIEF**: FAILURE TO PAY THE MINIMUM WAGE AND OVERTIME PURSUANT TO THE COLORADO OVERTIME AND MINIMUM PAY STANDARDS ORDER, 7 CCR 1103-1

**(All Plaintiffs Against All Defendants)**

214.     Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

215.     At all material times, Defendants have been "employers" within the meaning of the Colorado Overtime and Minimum Pay Standards Order and related older regulations (together, "COMPS Orders").

216.     At all material times, Defendants employed Plaintiffs within the meaning of the COMPS Orders.

217.     At all material times, Plaintiffs were "employees" of Defendants within the meaning of the COMPS Orders.

218.     Defendants failed to pay Plaintiffs minimum wage for all hours worked.

219.     The failure to pay minimum wage was willful because the Defendants knew or showed reckless disregard for the fact that Plaintiffs were covered by the Colorado Minimum Wage Act and therefore entitled to minimum wage.

220.     Defendants failed to pay Plaintiffs overtime for hours worked both in excess of 40 hours a week and in excess of 12 hours a day.

221.    The failure to pay overtime was willful because the Defendants knew or showed reckless disregard for the fact that Plaintiffs entitled to overtime.

222.    Plaintiffs demand payment in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing. Such payment should be made care of undersigned counsel at the listed address.

223.    Plaintiffs seek recovery of these unpaid wages and additional damages, costs, and attorney's fees pursuant to Colorado law.

**<u>FOURTH CLAIM FOR RELIEF</u>: FAILURE TO PAY WAGES DUE PURSUANT TO THE COLORADO WAGE CLAIM ACT, C.R.S. § 8-4-101, *ET SEQ.***

**(All Plaintiffs Against All Defendants)**

224.    Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

225.    At all material times, Defendants have been "employers" within the meaning of the Colorado Wage Claim Act.

226.    At all material times, Defendants employed Plaintiffs within the meaning of the Wage Claim Act.

227.    At all material times, Plaintiffs were "employees" of Defendants within the meaning of the Wage Claim Act.

228.    Defendants failed to pay Plaintiffs minimum wage for all hours worked.

229.    The failure to pay minimum wage was willful because the Defendants knew or showed reckless disregard for the fact that Plaintiffs were entitled to minimum wage.

230.    Defendants failed to pay Plaintiffs overtime for hours worked both in excess of 40 hours a week and in excess of 12 hours a day.

231.    The failure to pay overtime was willful because the Defendants knew or showed reckless disregard for the fact that Plaintiffs entitled to overtime.

232.    Plaintiffs demand payment in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing. Such payment should be made care of undersigned counsel at the listed address.

233.    Plaintiffs seek recovery of these unpaid wages and additional damages, costs, and attorney's fees pursuant to Colorado law.

**FIFTH CLAIM FOR RELIEF:** FAILURE TO PAY MINIMUM WAGE TO THE DENVER MINIMUM WAGE ORDINANCE, D.R.M.C. § 58-16, *ET SEQ.*

**(All Plaintiffs Against All Defendants)**

234.    Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

235.    At all material times, Plaintiffs were "workers" within the meaning of the Denver Minimum Wage Ordinance.

236.    At all material times, Defendants have been "employers" within the meaning of the Denver Minimum Wage Ordinance.

237.    As the employers of Plaintiffs, the Defendants were required to pay Plaintiffs minimum wage and overtime as required by D.R.M.C. § 58-16 and failed to do so.

238.    Plaintiffs seek recovery of these unpaid wages and any overtime based on those wages, interest, statutory penalties, statutory liquidated damages, costs, and attorney's fees, and any other legal or equitable relief as may be appropriate to fully remedy the violations according to the Denver Minimum Wage Ordinance.

## SIXTH CLAIM FOR RELIEF: CIVIL THEFT PURSUANT TO C.R.S. § 8-6-116 AND C.R.S. § 18-4-405

### (All Plaintiffs Against All Defendants)

239.   Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

240.   At all material times, Defendants have been "employers" within the meaning of the Colorado Minimum Wage Act.

241.   At all material times, Defendants employed Plaintiffs within the meaning of the Minimum Wage Act.

242.   At all material times, Plaintiffs were "employees" of Defendants within the meaning of the Minimum Wage Act.

243.   Defendants intentionally failed to pay Plaintiffs minimum wage.

244.   Specifically, Defendants knew that Plaintiffs were employees entitled to minimum wage pay standards but habitually failed to properly compensate for the work they performed.

245.   Defendants' intentional failure to pay minimum wage under the Minimum Wage Act constitutes civil theft pursuant to C.R.S. § 18-4-401. *See* C.R.S. § 8-6-116.

246.   Plaintiffs are entitled to treble damages, attorneys' fees to be determined at trial, costs, and statutory interest.

## SEVENTH CLAIM FOR RELIEF: CIVIL THEFT PURSUANT TO C.R.S. § 18-4-405

### (All Plaintiffs Against All Defendants)

247.   Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

248.    Defendants' theft of Plaintiffs' tips constitutes civil theft pursuant to C.R.S. § 18-4-401.

249.    The tips Plaintiffs' received for their work were the sole property of Plaintiffs.

250.    Those tips were "of value" within the meaning of Colorado's Civil Theft law.

251.    When Defendants, through Bouffard, removed tips earned by Plaintiffs from the tip jar, Defendants obtained control of the tips without authorization.

252.    Defendants intended to deprive Plaintiffs permanently of the use or benefit of the tips they removed from the tip jar.

253.    As a result, Plaintiffs are entitled to treble damages, attorneys' fees to be determined at trial, costs, and statutory interest.

### EIGHTH CLAIM FOR RELIEF: WILLFULLY FILING FRAUDULANT INFORMATION RETURNS PURSUANT TO 26 U.S.C. § 7434

#### (Plaintiffs Feltner and Savage Against All Defendants)

254.    Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

255.    Section 26 U.S.C. § 7434(a) provides "[i]f any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return."

256.    26 U.C.C. § 7434(f) provides that the term "information return" means any statement described in 26 U.S.C. § 6724(d)(1)(A).

257.    An IRS Form 1099-NEC form is an information return pursuant to 26 U.S.C §6724(d)(1)(A)(i).

258.     Defendants filed a 1099-NEC form with the IRS regarding wages Defendants purportedly paid to Feltner in 2020.

259.     The 1099-NEC form the Defendants submitted for Feltner was inaccurate and fraudulent because it misclassified Feltner as a "nonemployee," falsely stated that Feltner "refused" to provide his tax identification number, and, upon information and belief, underreported the amount of wages Defendants paid Feltner in 2020.

260.     Defendants knew that Feltner was an employee and that Feltner did not refuse to provide his tax identification number.

261.     Upon information and belief, Defendants knew that the 1099-NEC regarding Feltner did not accurately describe the wages Defendants paid Feltner during 2020.

262.     Defendants filed both a fraudulent 1099-NEC form and a fraudulent W-2 form with the IRS regarding wages Defendants purportedly paid to Savage in 2020.

263.     The 1099-NEC form the Defendants submitted for Savage was inaccurate and fraudulent because it underreported the amount of wages Defendants paid Savage in 2020 and misclassified Plaintiff Savage as a "nonemployee."

264.     The W-2 was fraudulent because it underreported the total amount of wages Defendants paid Savage in 2020.

265.     Defendants knew that neither the 1099-NEC nor the W-2 regarding Savage accurately described the wages Defendants paid Savage in 2020.

266.     Defendants knew that Savage was an employee.

267.     Defendants knew they had a duty to accurately record wages, tips, and other compensation paid to Plaintiffs.

268.    Defendants intentionally and voluntarily failed to accurately record wages, tips, and other compensation paid to Plaintiffs.

269.    Defendants knew they had a duty to accurately report wages, tips, and other compensation paid to Plaintiffs to the IRS by filing accurate information returns.

270.    Defendants intentionally and voluntarily filed an inaccurate and fraudulent 1099-NEC form regarding compensation paid to Feltner in 2020 with the IRS.

271.    Defendants intentionally and voluntarily filed an inaccurate and fraudulent 1099-NEC form regarding compensation paid to Savage in 2020 with the IRS.

272.    Defendants intentionally and voluntarily filed an inaccurate and fraudulent W-2 form regarding compensation paid to Savage in 2020 with the IRS.

273.    Therefore, Defendants willfully filed fraudulent information returns with respect to payments purported to be made to Feltner and Savage in 2020.

274.    Pursuant to 26 U.S.C. § 7434, Feltner and Savage are entitled to $5000 in damages per fraudulent return, costs, and attorneys' fees.

## NINTH CLAIM FOR RELIEF: UNJUST ENRICHMENT UNDER COLORADO LAW

### (All Plaintiffs Against All Defendants)

275.    Plaintiffs incorporate by reference all statements and allegations set forth in the preceding paragraphs.

276.    Defendants are liable to Plaintiffs in quasi-contract, including unjust enrichment under Colorado law.

277.    In particular, as a result of accepting work without providing proper compensation, Defendants received a benefit at the expense of Plaintiffs under circumstances that would make it unjust for Defendants to retain the benefit without commensurate compensation.

278.    As a result, Plaintiffs are entitled to damages.

**TENTH CLAIM FOR RELIEF**: DISCRIMINATION ON THE BASIS OF RACE AND COLOR PURSUANT TO THE COLORADO ANTI-DISCRIMINATION ACT (CADA) C.R.S. § 24-34-401 *ET SEQ.*

**(Plaintiff Savage Against All Defendants)**

279.    Plaintiff Savage incorporates by reference all statements and allegations set forth in the preceding paragraphs.

280.    At all material times, Defendants have been "employers" within the meaning of CADA.

281.    At all material times, Defendants employed Savage within the meaning of CADA.

282.    At all material times, Savage was an "employee" of Defendants within the meaning of CADA.

283.    Savage is Black and Haitian-American, and is thus a member of protected classes within the meaning of CADA.

284.    Defendants discriminated against Savage in the terms, conditions, and privileges of her employment, including but not limited to by assigning her additional duties without additional compensation, subjecting her to additional rules similarly situated white bartenders were not subject to or enforcing rules against her that were not enforced against similarly situated white bartenders, because of her race and color.

285.    Defendants also created, condoned, and failed to prevent and correct a hostile workplace for Savage during her employment, because of her race and color.

286.    The conduct and treatment Savage experienced was unwelcome.

287.    The conduct and treatment Savage experienced was sufficiently severe and pervasive to alter the conditions of her employment and created a hostile environment.

288.     A reasonable person in Savage's circumstances would find the environment in which she was required to work hostile.

289.     Defendants also constructively discharged Savage because of her race and color.

290.     Creation of a hostile work environment, discrimination in terms and conditions, and constructive discharge are adverse employment actions.

291.     At all material times, Savage performed the functions of her job competently, and was well-qualified for her position.

292.     Savage's race and color was a motivating factor for these adverse employment actions taken by Defendants.

293.     Defendants did not subject similarly situated non-Black, non-Haitian-American employees to similarly discriminatory terms, conditions, and privileges of employment.

294.     Defendants did not create a similarly hostile work environment for similarly situated non-Black, non-Haitian-American employees and treated such employees more favorably than Plaintiff Savage and any other Black and Haitian-American employees.

295.     At all material times, Defendants acted willfully and maliciously as they knew, or should have known, that their conduct was prohibited by law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not. Defendants failed to take reasonable care to prevent and correct the unlawful and discriminatory practices described herein.

296.     Defendants conducted no investigations into Savage's complaints of discrimination.

297.     As a direct and proximate cause of Defendants' discriminatory conduct, Savage suffered and will continue to suffer damages including, but not limited to, emotional anguish and distress, loss of income, loss of employment-related opportunities such as experience, other special and general damages, and attorneys' fees and costs.

**ELEVENTH CLAIM FOR RELIEF**: DISCRIMINATION ON THE BASIS OF RACE AND COLOR PURSUANT TO 42 U.S.C. § 1981 ("SECTION 1981")

**(Plaintiff Savage Against All Defendants)**

298.     Savage incorporates by reference all statements and allegations set forth in the preceding paragraphs.

299.     At all material times, Defendants have been "employers" within the meaning of the Section 1981.

300.     At all material times, Defendants employed Savage within the meaning of Section 1981.

301.     At all material times, Savage was an "employee" of Defendants within the meaning of Section 1981.

302.     Savage is Black and Haitian-American, and is thus a member of protected classes within the meaning of Section 1981.

303.     Defendants discriminated against Savage in the terms, conditions, and privileges of her employment, including but not limited to by assigning her additional duties without additional compensation, subjecting her to additional rules similarly situated white bartenders were not subject to or enforcing rules against her that were not enforced against similarly situated white bartenders, because of her race and color.

304.     Defendants also created, condoned, and failed to prevent and correct a hostile workplace for Savage during her employment, because of her race and color.

305.    The conduct and treatment Savage experienced was unwelcome.

306.    The conduct and treatment Savage experienced was sufficiently severe and pervasive to alter the conditions of her employment and created a hostile environment.

307.    A reasonable person in Savage's circumstances would find the environment in which she was required to work hostile.

308.    Creation of a hostile work environment, discrimination in terms and conditions, and constructive discharge are adverse employment actions.

309.    At all material times, Savage performed the functions of her job competently, and was well-qualified for her position.

310.    Savage's race and color was a motivating factor for these adverse employment actions taken by Defendants.

311.    Defendants did not subject similarly situated non-Black, non-Haitian-American employees to similarly discriminatory terms, conditions, and privileges of employment.

312.    Defendants did not create a similarly hostile work environment for similarly situated non-Black, non-Haitian-American employees and treated such employees more favorably than Plaintiff Savage and any other Black and Haitian-American employees.

313.    At all material times, Defendants acted willfully and maliciously as they knew, or should have known, that their conduct was prohibited by law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not. Defendants failed to take reasonable care to prevent and correct the unlawful and discriminatory practices described herein.

314.    Defendants conducted no investigations into Savage's complaints of discrimination.

315.    Defendants also constructively discharged Savage because of her race and color.

316.    As a direct and proximate cause of Defendants' discriminatory conduct, Savage suffered and will continue to suffer damages including, but not limited to, emotional anguish and distress, loss of income, loss of employment-related opportunities such as experience, other special and general damages, and attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

317.    Plaintiffs demand a jury for all issues so triable.

## PRAYER FOR RELIEF

318.    Plaintiffs respectfully request this Court enter judgment in favor of Plaintiffs against all Defendants and pray for the following relief:

a)    Damages for unpaid minimum wage, unpaid overtime, and unpaid wages;

b)    Compensatory and consequential damages, including emotional distress, on all claims allowed by law;

c)    Economic losses on all claims allowed by law;

d)    Special damages on all claims allowed by law and in an amount to be determined at trial;

e)    Statutory damages and penalties on all claims allowed by law;

f)    Punitive, exemplary, and liquidated damages on all claims allowed by law;

g)    Attorney's fees and costs;

h)    Pre- and post-judgment interest, when allowable by law; and

i)      All other legal and equitable relief as this Court and/or jury deems just and

proper.


Dated: November 12, 2021

Respectfully Submitted,

s/ *Brianne Power*
Brianne Power
Valerie L. Collins*
Towards Justice
P.O. Box 371680, PMB 44465
Denver, CO 80237-5680
Tel.: (720) 239-2606
brianne@towardsjustice.org
valerie@towardsjustice.org

Attorneys for the Plaintiffs

*D. Colo. admission forthcoming. Admitted to practice in Maryland. Colorado bar admission
pending. Practice temporarily authorized pending admission under C.R.C.P. 205.6.